IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:22-CV-158-BO

| | |
|---|---|
| OAKLEY FERTILIZER, INC., <br> Plaintiff, <br><br> v. <br><br> SAVAGE SERVICES CORPORATION, <br> and CAROLINA MARINE TERMINAL, <br> LLC, <br> Defendants. | ORDER |

This cause comes before the Court on defendants' motion for summary judgment [DE 41] and plaintiff's partial motion for summary judgment [DE 48] pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has responded, defendants have replied, and a hearing on the motion was held before the undersigned on March 7, 2024, in Elizabeth City, North Carolina. In this posture, the motion is ripe for ruling. For the reasons that follow, defendants' motion is granted and plaintiff's motion is denied.

BACKGROUND

On August 18, 2018, Oakley Fertilizer ("Oakley" or "plaintiff") and Carolina Marine Terminal ("CMT" or "defendant") entered into the Potash Agreement. The Potash Agreement covered the unloading, storage, and stevedoring of potash through a shipping terminal in Wilmington, North Carolina (the "Facility"). The Potash Agreement was to run for a term of five years, terminating on March 21, 2024.

Under the terms of the Potash Agreement, Oakley was required to pay a set amount for each short ton of potash brought through the Facility. Oakley committed to bringing a minimum of 50,000 short tons through the Facility per year, and to paying the difference between 50,000

short tons and the actual throughput if actual throughput fell short of the minimum. CMT promised to discharge 9,600 short tons of potash per weather working day. If CMT failed to meet that guaranteed discharge rate, then CMT would be obligated to pay Oakley the actual pro-rata demurrage, up to a maximum of $25,000 per weather working day.

Oakley missed the minimum throughput during the first year of the Potash Agreement and incurred a charge of $282,138.70. On November 30, 2020, plaintiff's territory manager Dan DeMartis contacted CMT's Facility Manager Randy Bennett to ask about importing and storing a new kind of fertilizer known as diammonium phosphate (DAP). Mr. DeMartis asked if the discharge rate would remain 9,600 short tons per day. Mr. Bennett responded, using his decades of experience to estimate a discharge rate of 7,200 short tons per day due to the unique properties of DAP, which is less dense than potash and tends to clump in humid air.

On May 1, 2021, Mr. DeMartis contacted Mr. Bennett to ask if CMT could unload the vessel "Pauline," a ship filled with DAP arriving in July. Mr. Bennett answered in the affirmative, but stated that it "might require an amendment" to the Potash Agreement, to which Mr. DeMartis agreed. [DE 45, Appx. 202, 203]

Unloading the Pauline was difficult and slow because of the unique properties of DAP, and Oakley billed CMT for demurrage in the amount of $62,227.78. CMT responded with videos and photos of the unloading process, showing how DAP clumped up in humid air and interfered with the discharging process. During negotiations, plaintiff agreed that it would recalculate the demurrage based on the 7,200 short ton discharge rate, and split the remaining difference because of how difficult the material was to work with.

On October 21, 2021, Mr. DeMartis contacted Mr. Bennett again about another shipment of DAP arriving in January, but did not provide the name of the ship. Meanwhile, another client

2

of CMT, Koch, informed CMT that they would have a shipment of urea arriving in the same time frame. DAP and urea are incompatible fertilizer products, and must be stored separately from each other. Equipment used to move the fertilizer must be thoroughly cleaned between uses. As it happened, Oakley's shipment of DAP and Koch's shipment of urea arrived on the same ship, the "Nord Bearing."

The Nord Bearing arrived on February 12, 2022. Following the unloading, Oakley sent a bill for demurrage in the amount of $68,666.67, revised to $67,133.33. The amount was calculated using the potash unloading rate of 9,600 short tons per day and a daily cap of $32,000. CMT refused to pay this bill, stating "we do not have an agreement for DAP we have one for potash." [DE 44, Appx. 146] Plaintiff took the position that the Potash Agreement covered any bulk fertilizer, except for urea. The parties failed to reach a resolution during negotiation or mediation. The present suit was filed the day after the last of the DAP had left the Facility.

## ANALYSIS

### I. *Scope of the Potash Agreement*

A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in

3

support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might affect the outcome of the suit under the governing law. *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotation marks and citations omitted). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

This case has been brought in diversity, and North Carolina state law applies. For a breach of contract claim to succeed, the plaintiff must be able to show "(1) the existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 530 S.E.2d 838, 848 (2000). For a valid contract to exist, the minds of the parties must meet and agree to the same proposition, with the same meaning. *Elks v. N. State Life Ins. Co.*, 75 S.E. 808, 810 (1912). "If the language of a contract is ambiguous, interpretation is a question of fact, not one of law." *Dockery v. Quality Plastic Custom Molding, Inc.*, 547 S.E.2d 850, 852 (N.C. Ct. App. 2001). Ambiguity exists when the language of the contract is reasonably susceptible to either of the interpretations asserted by the parties. *Glover v. First Union Nat'l Bank*, 428 S.E.2d 206, 209 (N.C. Ct. App. 1993). Summary judgment is appropriate only "if the language of a contract 'is clear and only one reasonable interpretation exists…'" *WRI/Raleigh LP v. Richardson*, 752 S.E.2d 260 (N.C. Ct. App. 2013).

Here, the first critical question is whether a valid contract exists as to DAP. Defendants contend that the Potash Agreement applies only to potash, while plaintiffs contend that the Agreement applies to all bulk fertilizers except for urea. For the reasons that follow, the Court finds that no valid contract exists as to fertilizers other than potash.

4

Looking at the plain language of the Potash Agreement, it is evident that the terms of the contract do not sufficiently address any specific fertilizers other than potash. The full name of the contract was the "Potash Storage, Handling and Stevedoring Agreement," and the agreement granted plaintiff the exclusive right to "receive and distribute potash" at the Facility. [DE 1-4 at 2, 3] CMT represented only that they would provide services to "vessels carrying potash" and described the storage container in which Oakley's Product would be stored with reference to the specific properties of potash. [DE 1-4 at 3]

Oakley argues that the Potash Agreement applies to "Product," which was defined as "bulk fertilizer products, excluding urea." [DE 1-4 at 2] The term "Product" is used many dozens of times throughout the Agreement, but is not used in key provisions such as those detailing the volume of the storage vessel [DE 1-4 at 3] and the guaranteed discharge rate [DE 1-4 at 8]. As evidenced by this lawsuit, such provisions are critical for calculating shipping amounts, storage capacity, demurrage, and guaranteed discharge rates.

In support of its position that the definition of the term "Product" governs interpretation of the Agreement, Oakley points to several emails exchanged between the parties prior to the final signing of the Potash Agreement. However, it is impermissible for the Court to consider parol evidence that contradicts or is inconsistent with a fully integrated document. *Craig v. Kessing*, 253 S.E.2d 264, 265 (N.C. 1979). The Potash Agreement contains a standard merger clause, and is thus fully integrated. [DE 1-4 at 19, 20] The Court may consider parol evidence if the contract is ambiguous, but such parol evidence is inadmissible when the meaning of a contract is plain on its face. *Vestal v. Vestal*, 271 S.E.2d 306, 309 (N.C. Ct. App. 1980).

Such facial unambiguity is evident in Section 7.e, which defines the guaranteed daily discharge rate as "9,600 short tons of Product (based on the properties of potash)." This language

5

plainly limits the applicability of the 9,600 short ton discharge rate to potash, as the properties of other fertilizers would naturally affect the possible discharge rate. In plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, plaintiff agrees that 7(e) requires that "the stated guaranteed unloading rate (9,600 short tons) would be changed based upon the difference in properties of the product brought in comparison to the properties of potash." [DE 54 at 5] At most, the usage of the term "Product" indicates CMT's willingness to handle certain other fertilizers on behalf of Oakley, and a willingness to negotiate the conditions governing the handling of such fertilizers if the need arose. Parol evidence indicating otherwise is inadmissible.

The course of dealing between the parties further indicates that neither party believed DAP was sufficiently covered by the original Potash Agreement. When Mr. DeMartis approached Mr. Bennett in November 2020 and May 2021 about CMT's capacity to handle DAP, plaintiff asked if the costs associated with unloading DAP would be the same as for potash. [DE 45, Appx. 200] This indicates that the plaintiff did not consider the original Potash Agreement to conclusively cover all "bulk fertilizers, excepting urea" as alleged here.

Furthermore, when Mr. Bennett indicated that an amendment to the Agreement would be necessary for CMT to handle DAP, Mr. DeMartis agreed and shared that information with plaintiff's Vice-President, Mr. Edward S. Vance. [DE 45, Appx. 264] After the unloading of the vessel Pauline, plaintiff agreed to lower the discharge rate to 7,200 short tons per day based on the properties of DAP. Conversely, when the Nord Bearing was unloaded, plaintiff calculated demurrage using the 9,600 short ton potash rate—well above the 7,200 short ton DAP discharge rate agreed upon for the Pauline. Furthermore, plaintiff used a daily fee cap of $32,000, a figure found nowhere within the confines of the original Potash Agreement. [DE 45, Appx. 199] These

6

on-the-fly negotiations and calculations indicate that neither party relied on the original Potash Agreement when conducting business with DAP.

Viewing the evidence in the light most favorable to the non-moving party, the inconsistent usage of the term "Product" throughout the agreement is insufficient to establish a separate agreement covering all bulk fertilizers excepting urea. Looking at the plain language of the contract and the conduct between the parties, the only reasonable interpretation is that the Potash Agreement was limited to potash. Accordingly, since there was no meeting of the minds regarding any other fertilizers, no valid contract exists as to the unloading, storage, stevedoring, and calculation of demurrage for DAP.

## II.   *Savage Services Corporation Liability*

Because no valid contract for DAP existed between CMT and Oakley, it is apparent that Savage Service Corporation could not have assumed or tortiously interfered with such a contract, even if it wished to. As such, Savage Services Corporation is not a proper defendant to this action and the Court does not consider Oakley's claims of tortious interference with contract.

## III.   *CMT's Counterclaims*

Following the filing of this lawsuit, CMT counterclaimed for plaintiff's failure to meet minimum throughput requirements and to pay monthly dome storage fees.

Oakley claims that the import of the DAP fertilizer on the Nord Bearing should have been credited as throughput, just as CMT credited the DAP on the Pauline as throughput. [DE 17-6] It is not the place of the Court to declare what the actions of the parties should be, but simply to determine the legal force of the instruments already agreed to. As determined previously, there is no contract governing any fertilizer other than potash, and CMT is not bound by a prior, independently negotiated, one-time decision to forever accept DAP as throughput.

7

Further, Oakley does not deny that it has failed to pay the monthly dome storage fee provided for in the Potash Agreement. [DE 54 at 27] Instead, plaintiff argues that it was justified in ceasing payment because CMT breached the contract by declining to allow another vessel carrying DAP to be unloaded at the Facility. Since there was no valid contract concerning DAP, however, CMT could not have breached. And even in the event of breach, the unilateral suspension of performance was not a remedy agreed to by the parties. [DE 1-4 at 16] As such, Oakley is required by contract to pay the unpaid portion of the storage fees.

## CONCLUSION

For these reasons, the Court DISMISSES WITH PREJUDICE plaintiff's claims against Savage Services Corporation. The Court GRANTS defendant Carolina Marine Terminal's motion for summary judgment [DE 41]. Accordingly, the Court DENIES plaintiff's motion for partial summary judgment [DE 48].

The Court GRANTS defendant CMT's counterclaims regarding plaintiff's failure to pay storage fees and to meet the minimum annual throughput requirements for the remaining term of the Potash Agreement. Plaintiff Oakley Fertilizer, Inc. is ORDERED to pay $280,353.60 in dome storage fees and $1,714,000.00 in minimum annual throughput damages. Pre- and post-judgment interest is to be applied as provided by law.

The Court DECLINES to enter a declaratory judgment in this matter.

SO ORDERED, this 18 day of September 2024.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE